**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **FREE AND SOVEREIGN STATE OF CHIHUAHUA**, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | |
| **CESAR HORACIO DUARTE JAQUEZ, BERTHA OLGA GOMEZ FONG, OLGA SOFIA DUARTE GOMEZ, OLGA DUARTE JAQUEZ CESAR ADRIAN DUARTE GOMEZ, CAD CONSTRUCTION, INC., GABRIELA ARMENDARIZ CHAPARRO, MANUEL ALBERTO GARZA, 44 FOUNTAIN RD., LLC, AND 110 S. FESTIVAL, LLC.,** | § § § § § § § § § § § § § | **EP-20-CV-00086-DCG** |
| *Defendants*. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Presently before the Court is Plaintiff Free and Sovereign State of Chihuahua's ("State of Chihuahua") "Motion to Remand" (ECF No. 7) ("Motion"), filed on April 29, 2020. Therein, the State of Chihuahua requests the Court to remand the instant case to the state court pursuant to 28 U.S.C. § 1447(c). For the reasons that follow, the Court **GRANTS** the State of Chihuahua's Motion.

## I.   BACKGROUND

The State of Chihuahua, a foreign sovereign state and political subdivision of Mexico, initially brought this civil lawsuit in a Texas state court against its former governor, Cesar Duarte Jaquez ("Duarte"), his wife, two children, his sister, and other entities and associates (collectively, "Defendants"). Notice of Removal at 15, ECF No. 1. According to the complaint, Duarte fled to the United States after Mexico indicted him with more than 21 counts of

corruption and fraud for plundering hundreds of millions of dollars in government funds during his tenure as governor of the State of Chihuahua. *Id.* at 16. Specifically, the complaint alleges that Duarte conspired with his family and associates to abscond with these stolen government funds, which were then used to make investments and purchase luxury homes and cars in the United States. *Id.* Thus, the State of Chihuahua filed this lawsuit seeking to recoup these funds from Duarte and those who acted in concert with him, and to recover any assets purchased with these funds. *Id.*

Defendants subsequently removed to federal court on the basis of federal jurisdiction. *Id.* at 1. Defendants contend that this Court has subject matter jurisdiction over this suit because, although all of the State of Chihuahua's claims against them are rooted in state law, these claims raise substantial questions of federal law by implicating foreign policy concerns. *Id.* at 4–5. The State of Chihuahua now moves to remand on the ground that no federal question jurisdiction exists. Mot. at 2–3, ECF No. 7.[1]

## II.   STANDARD

"Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). "Absent diversity jurisdiction [under 28 U.S.C. § 1332], federal-question jurisdiction is required." *Id.* "A federal question exists 'only in those cases in which a well-pleaded complaint establishes that either federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Singh v. Duane*

---

[1] While this motion was pending, on July 8, 2020, Duarte was arrested by the U.S. Marshals in Miami on an extradition request from the Mexican government to the U.S. Department of Justice. Associated Press, *Cesar Duarte, ex-governor of Chihuahua arrested in Miami on extradition request*, (July 8, 2020 8:41 PM), https://www.elpasotimes.com/story/news/crime/2020/07/08/cesar-duarte-former-chihuahua-governor-arrested-miami-extradition/5403484002/.

*Morris LLP*, 538 F.3d 334, 337 (5th Cir. 2008) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 27–28 (1983)); *Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 542 (5th Cir. 1997).

As such, cases premised on state-law claims "may still arise under the laws of the United States if a well-pleaded complaint establishe[s] that [the] right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd.*, 463 U.S. at 13. In other words, "federal jurisdiction is unavailable unless it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims." *Id.* Nevertheless, "[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense[.]" *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009). For that reason, "[t]he [well-pleaded complaint] rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Williams,* 482 U.S. at 392.

Under 28 U.S.C. § 1447(c), if a federal district court determines "at any time before final judgment . . . that [it] lacks subject matter jurisdiction, the case shall be remanded." The removing parties "bear[] the burden of establishing that federal jurisdiction [exists]." *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995); *see also In re Tobacco/Govtl. Health Care Costs Litig.*, 100 F. Supp. 2d 31, 35 (D.D.C. 2000) ("[T]he party moving to remand does not have the burden; the burden is on the removing defendants to show that federal jurisdiction exists and that the motion for remand should be denied."). Federal courts strictly construe the removal statutes, "and any doubt about the propriety of removal must be resolved in favor of remand." *Gasch v. Hartford Acc. & Indent. Co.*, 491 F.3d 278, 281–82 (5th Cir. 2007).

## III.   DISCUSSION

The claims that the State of Chihuahua asserts here are unquestionably rooted in state law.  Notice of Removal at 19–21 (asserting claims of conversion, constructive trust, civil conspiracy, and claims under the Texas Theft Liability Act and Texas Penal Code §31.03(e)(7)).  None of the claims has an element premised on a right created by Congress or the Constitution.  But Defendants contend that the Court has federal jurisdiction over these state-law claims because they turn on substantial questions of federal law.  According to Defendants, these state-law claims implicate important concerns for United States foreign relations, including: (1) the act of state doctrine; (2) foreign official immunity; and (3) the federal common law of foreign relations.  *Id.*  The Court now addresses these arguments in that order.

### A.   Act of State.

Defendants argue that the State of Chihuahua's claims "necessarily raise issues under the [act of state] doctrine because they require consideration of the State of Chihuahua's 'official' actions during . . . Duarte's tenure [as governor of the state]."  Resp. in Opp'n at 9, ECF No. 10.  Further, Defendants argue that these state-law claims implicate the act of state doctrine because they "arise from conduct that occurred in a foreign state pursuant to the exercise of foreign authority."  Notice of Removal at 6.  Upon scrutinizing the record, the Court concludes that no act of state issue is present as a necessary element to resolve any of the State of Chihuahua's state-law claims.

The act of state doctrine "limits, for prudential rather than jurisdictional reasons, the adjudication in American courts of the validity of a foreign sovereign's public acts."  *Walter Fuller Aircraft Sales, Inc. v. Republic of Phil.,* 965 F.2d 1375, 1387 (5th Cir. 1992).  "The doctrine applies to bar an action when 'the relief sought or the defense interposed would have

required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.'" *Id.* (quoting *W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp.*, Int'l, 493 U.S. 400, 405 (1990)).  Thus, "[a]ct of state issues only arise when a court must decide—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign.  When that question is not in the case, neither is the act of state doctrine." *W. S. Kirkpatrick*, 493 U.S. at 406.

Here, the act of state doctrine has no bearing in this case.  First, the act of state doctrine typically applies upon a contested intrusion by a court in the United States into the sovereignty of a foreign government within its own territory.  *See, e.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 439 (1964) ("Since the act of state doctrine proscribes a challenge to the validity of the Cuban expropriation decree in this case, any counterclaim based on asserted invalidity must fail."); *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) (refusing to adjudicate an action against Hernandez, a revolutionary Venezuelan military commander whose government had been later recognized by the United States, brought by an American citizen who claimed that he had been unlawfully assaulted, coerced, and detained in Venezuela by Hernandez).  Yet here, it is the foreign sovereign itself which willingly subjects itself to the judicial process and laws of a state in the United States by seeking a remedy through adjudication in a court of the same.  Further, this foreign sovereign alleges that Defendants committed torts in violation of the laws of the State of Texas, which is also the situs of the property involved in this case.  Additionally, the act of state doctrine is not applicable merely because a foreign sovereign is a party to a lawsuit. *See Torres*, 113 F.3d at 542–43 ("That Peru has injected itself into this lawsuit does not, standing alone, create a question of federal law.").

Second, the state-law claims in the complaint do not appear to precipitate a determination of the validity of any foreign sovereign act.  Put differently, nowhere in its complaint does the State of Chihuahua interject a federal issue in this case by seeking to employ the Texas state court to enforce one of its sovereign acts taken within its own territory.  In the parallel case of *Republic of Phil. v. Marcos*, 806 F.2d 344 (2d Cir. 1986) [hereinafter, *Marcos I*], the foreign government brought an action in a New York state court against its former head of state to recoup property that he allegedly looted during his tenure as head of state.  Before removal to the federal court, the President of the Republic of the Philippines issued an executive order authorizing the Commission on Good Government to appeal to foreign countries to freeze the defendants' assets abroad.  This order, the Second Circuit noted, "contributed heavily to interjecting a federal issue into the case sufficient to confer federal question subject matter jurisdiction."  *Id.* at 347.  The Second Circuit reasoned that "federal jurisdiction [was] present in any event because the claim raise[d], as a necessary element, the question whether . . . the American courts [should] enforce the foreign government's directives to freeze property . . . ."  *Id.* at 354.  But here, unlike in *Marcos I*, the state-law claims in the complaint are not premised on the enforcement of some sovereign act either from the State of Chihuahua or the Mexican government.  No such foreign sovereign act, executive order, or directive exists here.

And third, most importantly, the act of state doctrine does not apply to Duarte's alleged acts for private financial benefit "purported to be done in the name of the foreign sovereign." *New York Land Co. v. Republic of Phil.*, 634 F. Supp. 279, 289 (S.D.N.Y. 1986), *aff'd sub nom. Republic of Phil. v. Marcos*, 806 F.2d 344 (2d Cir. 1986).  Defendants attempt to interject the act of state doctrine by arguing that the state-law claims in the complaint raise issues of acts of state because "they require consideration of the State of Chihuahua's 'official' actions during

[Duarte's] tenure, *i.e.*, whether contracts were properly awarded to certain vendors." Resp. in Opp'n at 9; *see, e.g.*, *Grynberg Prod. Corp. v. British Gas, p.l.c.*, 817 F. Supp. 1338, 1357–58 (E.D. Tex. 1993) (finding that the asserted state-law claims raised a federal question because they implicated the act of state doctrine by challenging the validity of a foreign government award of mineral rights in its own territory).

"The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 697 (1976) (citing *Sabbatino*, 376 U.S. at 427–428, 431–433). But the act of state doctrine "is not a promise to the ruler of any foreign country that his conduct, if challenged by his own country after his fall, may not become the subject of scrutiny in our courts." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1360 (9th Cir. 1988) (*en banc*) [hereinafter, *Marcos II*]. The doctrine does not guarantee immunity to an ex-chief magistrate that invokes the magic words "act of state" to cover his or her past performance because "[t]he doctrine is meant to facilitate the foreign relations of the United States, not to furnish the equivalent of sovereign immunity to a deposed leader." *Id.* at 1360–61. Put plainly, the doctrine generally does not protect foreign officials from adjudication as to their acts for personal profit "that do not purport to be done in the name of the foreign sovereign." *New York Land Co.*, 634 F. Supp. at 289; *see also Jimenez v. Aristeguieta*, 311 F.2d 547, 557–58 (5th Cir. 1962) ("Appellant's acts constituting the financial crimes of embezzlement or malversation, fraud or breach of trust, and receiving money or valuable securities knowing them to have been unlawfully obtained as to which probable cause of guilt had been shown were not acts of Venezuela sovereignty.").

As such, none of the foreign policy justifications that warrant a federal forum insofar as they relate to the act of state doctrine are present here.  This Court has received no statement of interest or other indication, either from our political branches or from the Mexican government, that U.S.-Mexico foreign relations would be hindered or affected by judicial consideration of these state-law claims in state court.  *Cf. Torres*, 113 F.3d at 542 ("The state of Peru has protested the lawsuit by filing a letter with the State Department and by submitting an amicus brief to this court.  Peru maintains that the litigation implicates some of its most vital interests and, hence, will affect its relations with the United States."); *Grynberg*, 817 F. Supp. at 1356-57 ("Further evidence of substantiality is the fact that the Government of the Republic of Kazakhstan has taken the time and effort to write this court with respect to this case.  Kazakhstan demands that any resolution of Grynberg's rights to mineral interests in the Karachaganak Field take place in Kazakhstan.").  If anything, the record strongly suggests that U.S.-Mexico foreign relations are not at stake because it is the foreign sovereign *itself* which has affirmatively chosen adjudication in Texas state court, not federal court—and in fact, resists such a forum.

Duarte is also not the State of Chihuahua's head of state anymore.  Indeed, Duarte's "former domain has turned against him and seeks the recovery of what it claims he has stolen."  *Marcos II*, 862 F.2d at 1361.  Moreover, Duarte was not an "absolute autocrat" or the "state" itself, "but the head of state, bound by the laws that applied to him."  *Id.*  Duarte cannot inject a federal question into this case merely by invoking the act of state doctrine as a former head of a foreign sovereign, especially when that foreign sovereign now asserts that there is no danger of interfering with the conduct of foreign policy or of the adjudication in state court giving offense to it.  In short, Duarte cannot invoke the act of state doctrine to cover alleged tortious conduct under Texas law because "[t]he doctrine is meant to facilitate the foreign relations of the United

States, not to furnish the equivalent of sovereign immunity to a [former] leader." *Id.* at 1360–61. Therefore, the act of state doctrine has no bearing in this case.

## B.  Foreign Official Immunity.

Defendants next argue that the State of Chihuahua's state-law claims "necessarily implicate the foreign official immunity doctrine [because] . . . [c]ourts must apply the foreign official immunity doctrine when the claims in the complaint arise from acts taken by foreign officials in their official capacity."  Notice of Removal at 6 (citing *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010) [hereinafter, *Samantar I*]).  According to Defendants, since the state-law claims arise from Duarte's "official acts" during his tenure as governor, they argue that the "claims necessarily require a federal court to adjudicate the federal question of . . . Duarte's entitlement to foreign official immunity." *Id.*  After reviewing the record, the Court concludes that foreign official immunity is also not present as a necessary element to resolve any of the State of Chihuahua's state-law claims.

The doctrine of foreign sovereign immunity developed as a matter of common law long before the Foreign Sovereign Immunities Act ("FSIA") was enacted in 1976. *Samantar I*, 560 U.S. at 311.  The case of *Schooner Exchange v. McFaddon*, 7 Cranch 116 (1812), is generally viewed as the source of  foreign sovereign immunity in the United States. *Republic of Austria v. Altmann*, 541 U.S. 677, 688 (2004).  In that case, the Supreme Court explained that foreign sovereign immunity was a matter of comity between nations because members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign. *Id.* (citing *McFaddon*, 7 Cranch at 134).

Under the common law, courts applied a two-step procedure to address claims of foreign sovereign immunity. *Samantar I*, 560 U.S. at 311. Under this procedure, the diplomatic representative of the sovereign could request a suggestion of immunity ("SOI") from the U.S. State Department, which would then file an SOI with the court if it saw fit. *Id.* (citations omitted). The court would then surrender its jurisdiction because a grant of immunity from the State Department was binding. *Id.* (citations omitted). But if the State Department did not recognize immunity in its filing or did not file anything after the request, a court went to the second step and "had authority to decide for itself whether all the requisites for such immunity existed." *Id.* at 311–12 (citations omitted). In making that decision, a district court inquired whether the ground of immunity was one which it was the established policy of the State Department to recognize. *Id.* at 312 (citations omitted). "Although cases involving individual foreign officials as defendants were rare, the same two-step procedure was typically followed when a foreign official asserted immunity." *Id.*

In 1952, State Department policy dictated that foreign sovereign immunity was confined to suits involving the foreign nation's public acts, not a nation's purely commercial acts. *Id.* at 313. This policy threw immunity determinations into disarray after a series of inconsistent applications in the lower courts, prompting Congress to respond by enacting the FSIA in 1976. *Id.* As it stands today, the FSIA provides foreign states presumptive immunity with some exceptions, including one for purely commercial acts. *Id.*; *Altmann*, 541 U.S. at 691. But in 2010, the Supreme Court concluded in *Samantar v. Yousuf*, 560 U.S. 305 (2010), that the FSIA does not provide immunity to individual foreign officials, who must instead rely on traditional common-law immunity that predated the FSIA. *Samantar I*, 560 U.S. at 324. Thus, to date, the common law procedure still applies to foreign officials claiming immunity.

In this case, no indication in the record exists to suggest that foreign official immunity is even at issue.  After *Samantar I*, foreign officials claiming immunity must still follow the two-step common law procedure, which includes requesting an SOI from the State Department.  *See Abiola v. Abubakar*, 267 F. Supp. 2d 907, 912 (N.D. Ill. 2003), *aff'd and remanded*, 408 F.3d 877 (7th Cir. 2005) ("Because the FSIA does not apply to heads of state, the pre-1976 suggestion of immunity procedure survives the statute's enactment with respect to heads of state.").  However, the record contains no indication that Duarte has made any effort to request an SOI directly from the State Department, or to contact the Mexican government to request one on his behalf.[2]  *Cf. Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir. 2019), *cert. denied*, 19-185, 2020 WL 3492651 (U.S. June 29, 2020) ("On August 9, 2016, the DRC Ambassador to the United States sent a letter to the United States Department of State denying Plaintiff's allegations and requesting that the State Department submit a suggestion of immunity to the court.  This request was reiterated in a December 13, 2016 follow-up letter.  However, the State Department did not accede to the plea of the DRC, and never issued a request that the District Court surrender its jurisdiction."); *Dogan v. Barak*, 932 F.3d 888, 891 (9th Cir. 2019) ("In December 2015, Israel asked the U.S. Department of State to file a[n] . . .[SOI] on behalf of Barak."); *Yousuf v. Samantar*, 699 F.3d 763, 767 (4th Cir. 2012) [hereinafter, *Samantar II*] ("The United States submitted to the district court a[n] [SOI] announcing that the Department of State, having considered 'the potential impact of such an immunity decision on the foreign relations interests of the United States,' . . . had determined that Samantar was not entitled to immunity from plaintiffs' lawsuit."); *Habyarimana v. Kagame*, 821 F. Supp. 2d 1244, 1258 (W.D. Okla. 2011), *aff'd*, 696 F.3d 1029

---

[2] If anything, in view of Duarte's  recent arrest on an extradition request, it is doubtful that either the State Department would file an SOI on Duarte's behalf or the Mexican government would request one for him.

(10th Cir. 2012) "([T]he government of the Republic of Rwanda transmitted to the U.S. Government a request for the State Department to submit to this Court a statement of interest in the claims underlying this lawsuit, or a suggestion of immunity regarding President Kagame."); *Doe v. Roman Catholic Diocese of Galveston-Houston*, 408 F. Supp. 2d 272, 279 (S.D. Tex. 2005) ("In this case, the United States, through its Suggestion of Immunity and letter from the Department of State Legal Adviser, has explicitly requested that Cardinal Ratzinger, now Pope Benedict XVI and the head of the Holy See, be dismissed from this lawsuit on the basis of head-of-state immunity.").

Although Defendants need not request an SOI to make a showing that foreign official immunity is at issue in this case, case law from other courts suggests that they could have made this showing, at the very least, through statements of interest or other filings from the foreign government from which Duarte would have derived his foreign immunity.  *See, e.g.*, *Victory Transport Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 358 (2d Cir. 1964) (addressing the issue of foreign official immunity despite the fact that "the court ha[d] received no communication from the State Department concerning [its] immunity" because the Spanish Ambassador to the United States had written a letter to the court claiming immunity for the Comisaria General); *In re Terrorist Attacks on September 11, 2001*, 122 F. Supp. 3d 181, 187–89 (S.D.N.Y. 2015) ("Neither Al–Swailem nor Saudi Arabia has sought a suggestion of immunity from the State Department, and the Executive Branch has not indicated a desire to weigh in. . . . [But] the Saudi government, through its Ambassador, has requested that this Court grant common law sovereign immunity to Al–Swailem, and has declared that all alleged actions were taken by Al–Swailem in his official capacity as head of the SRC and the SJRC."); *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 10–12 (D.D.C. 2014) (addressing the issue of foreign official

immunity because the Swiss Confederation, a co-defendant, conceded that Mortada was one of its employees, despite the fact that "there [was] no indication that Mortada or the Swiss Confederation requested a suggestion of immunity from the State Department.").  Yet, the record here is devoid of any such statements of interests or filings.

Further, the Court declines to hold that any defendant can freely invoke foreign official immunity, with neither a showing that they attempted to obtain an SOI, or a statement of interest or filing from the foreign sovereign from which the immunity would derive, to obtain federal question jurisdiction.  Such a holding would open the floodgates to federal court for any defendant with some minimal connection to a foreign sovereign in any state-law matter.  *See Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 231 (D.D.C. 2018), *aff'd*, 18-7170, 2019 WL 668339 (D.C. Cir. Feb. 15, 2019), *and aff'd sub nom. Doe v. Buratai*, 792 F. App'x. 6 (D.C. Cir. 2019) ("Significant, high-level 'decision-making authority is not ... required' for immunity and . . . the rank of the agent who performed the act [is] not the determining factor.") (quoting *Rishikof*, 70 F. Supp. 3d at 13).  Under such holding, while a federal court may ultimately determine that immunity has no bearing in the case after removal, the court would still have to entertain the merits of the remaining non-federal claims before it out of judicial efficiency and economy.  *See* 28 U.S.C.A. § 1367 ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").  Hence, any defendant could easily protract the litigation by frivolously asking the presiding court to determine whether foreign official immunity is at issue before it addresses the merits of any remaining non-federal claims.  Therefore, the Court concludes that Defendants cannot simply inject a federal issue by

hastily implicating foreign official immunity with neither a showing that they attempted to obtain

an SOI for Duarte, or at the very least, a statement of interest or filing from the foreign sovereign

from which the immunity would derive.

Moreover, by bringing this civil lawsuit, the State of Chihuahua has already preempted

Duarte from raising foreign official immunity because it has waived any immunity Duarte could

have possibly asserted.  Foreign official immunity is not an individual right but an "attribute of

state sovereignty," a privilege that can be revoked by the foreign state from which it derives.  *In

re Doe*, 860 F.2d 40, 45 (2d Cir. 1988); *see also Paul v. Avril*, 812 F. Supp. 207, 211 (S.D. Fla.

1993) ("Immunity is a grant in a sense awarded at the sovereign's discretion.").  Thus, it logically

follows that whatever immunity may survive for a former head of state may be waived by the

current government of the foreign sovereign.  *Id.*  Some courts have found that "[s]uch waiver

must be explicit."  *Lafontant v. Aristid*e, 844 F. Supp. 128, 134 (E.D.N.Y. 1994) (citing *Libra

Bank Ltd. v. Banco Nacional de Costa Rica*, 676 F.2d 47, 49 (2d Cir. 1982)).

Here, Duarte is the former head of state of the State of Chihuahua.  Thus, any foreign

official immunity Duarte could raise before a court in the United States would derive exclusively

from the State of Chihuahua, not from the federal Mexican government.  *See Omari v. Ras Al

Khaimah Free Trade Zone Auth.*, 16 CIV. 3895 (NRB), 2017 WL 3896399, at *10 (S.D.N.Y.

Aug. 18, 2017), *aff'd sub nom. El Omari v. Kreab (USA) Inc.*, 735 F. App'x. 30 (2d Cir. 2018)

(finding that defendant, the former head of a political subdivision of his foreign country, could

not derive immunity from his foreign country's government).  From the record, the State of

Chihuahua has evidently waived Duarte's foreign official immunity by bringing this civil lawsuit

against him for acts outside the scope of his authority as governor of the state and arguing

against Duarte's bid for immunity.  *Hilao v. Estate of Marcos (In re Est. of Ferdinand Marcos,*

*Human Rights Litig.)*, 25 F.3d 1467, 1472 (9th Cir. 1994) ("Immunity is extended to an individual only when acting on behalf of the state because actions against those individuals are the practical equivalent of a suit against the sovereign directly."); *Samantar II*, 699 F.3d at 774–75 ("A foreign official or former head-of-state will therefore not be able to assert this immunity for private acts that are not arguably attributable to the state, such as drug possession or fraud.").

In effect, while it has not filed a "waiver" stating that it "has hereby waived Cesar Duarte's foreign official immunity," the State of Chihuahua has explicitly waived any immunity Duarte could have raised by asserting that (1) it has indicted Duarte with more than 21 counts of corruption and fraud; (2) it repudiates any of Duarte's private acts that he purportedly performed within the scope of his duty as an official; and (3) "Defendants cannot now seek the shelter of the same state which expressly disavows the former administration and seeks the recovery of its stolen assets." Mot. at 11; *In re Est. of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d at 1472 ("A lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against another government in United States courts. This is evidenced by the Philippine government's agreement that the suit against Marcos proceed."). Therefore, foreign official immunity is not at issue in this case.

## C.  Federal Common Law of Foreign Relations.

Defendants finally argue that the state-law claims in the complaint arise under "the federal common law of foreign relations because they involve a [foreign sovereign] state suing its former governor for conduct occurring within its own borders pursuant to the exercise of official authority." Notice of Removal at 7 (citing *Marcos I*, 806 F.2d at 354). Also, Defendants assert that the fact "that a foreign sovereign is the plaintiff in this case is all the more reason to conclude that the case has serious implications for U.S.-Mexico relations." Resp. in Opp'n. at

13.  Hence, Defendants contend that "[b]ecause such claims 'raise substantial questions of federal common law by implicating important foreign policy concerns,' they are properly removed to federal court."  Notice of Removal at 7 (quoting *Torres*, 113 F.3d at 543).  After due consideration, the Court concludes that this case does not arise under the federal common law of foreign relations.

In *Torres v. Southern Peru Copper Co.*, 113 F.3d 540 (5th Cir. 1997), the Fifth Circuit held that "a complaint raises substantial questions of federal common law" when it implicates "important foreign policy concerns."  *Torres*, 113 F.3d at 543.  In that case, more than 700 Peruvian plaintiffs sued a Peruvian mining company in Texas state court, "seeking damages for activities and policies in which the [Peruvian] government actively ha[d] been engag[ing]."  *Id.* at 541–43.  The Peruvian government "protested the lawsuit by filing a letter with the State Department and by submitting an amicus brief to [the] court."  *Id.* at 542.  The Fifth Circuit found federal question jurisdiction grounded on the federal common law of foreign relations because the action struck "not only at [Peru's] vital economic interests but also at Peru's sovereign interests."  *Id.* at 543.  However, the Fifth Circuit noted that Peru's opposition to the suit alone did not create a question of federal law, but rather its "vigorousness in opposing the action" which alerted the court to important foreign policy implications.  *Id.*; *see also Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1377 (11th Cir. 1998) (noting that federal question jurisdiction exists in cases "[w]here a state law action has as a substantial element an issue involving foreign relations or foreign policy matters.").

But the Fifth Circuit has subsequently clarified that "[f]ederal jurisdiction based on the [federal] common law of foreign relations is limited in scope," and "federal jurisdiction does not attach to every suit that involves foreign nationals."  *Espinola-E v. Coahoma Chem. Co.*, 248

F.3d 1138, 2001 WL 85834, at *1 (5th Cir. 2001) (citing *Marathon Oil Co. v. Ruhrgas*, A.G.,

115 F.3d 315, 320 (5th Cir. 1997), *rev'd on other grounds sub nom. Ruhrgas AG v. Marathon Oil

Co.*, 526 U.S. 574 (1999); *Aquafaith Shipping, Ltd. v. Jarillas*, 963 F.2d 806, 808 (5th Cir.

1992)); *see also Delgado v. Shell Oil Co.*, 890 F. Supp. 1324, 1348 (S.D. Tex. 1995), *aff'd*, 231

F.3d 165 (5th Cir. 2000) ("[N]ot every claim implicating the international law of foreign

relations will give rise to federal question jurisdiction."); *Unión De Pasteurizadores De Juárez

Sociedad Anónima De Capital Variable v. Fuentes*, EP-16-CV-137-KC, 2016 WL 3512272, at

*3 (W.D. Tex. June 21, 2016) (same).

Here, none of the state-law claims in the complaint involve the federal common law of

foreign relations because they do not implicate any foreign relations concerns or foreign policy

matters.  The fact that the State of Chihuahua is a named party in the case does not alone

implicate foreign relations concerns to warrant a finding of federal jurisdiction—especially when

this foreign sovereign is the plaintiff that affirmatively seeks to adjudicate its state-law claims in

state court.  *Torres*, 113 F.3d at 542–43.  Moreover, as already discussed in detail *supra*, none of

the State of Chihuahua's state-law claims involve issues of act of state or foreign official

immunity.  Defendants also fail to identify any other uniquely federal or substantial foreign

policy interests that justify a federal forum, either from the State of Chihuahua or the Mexican

government.  Instead, they only superficially discuss Mexico's "sovereign interests and foreign

relations" in a footnote.  Resp. in Opp'n at 14 n.3.

But above all, neither our political branches nor the Mexican government have protested

against this lawsuit as the Peruvian government did in *Torres*.  Defendants point out that,

throughout this year, the State of Chihuahua has released official pubic statements related to this

lawsuit, which "confirms that this case raises political issues that implicate important federal

foreign relations considerations." Resp. in Opp'n at 10 n.2.[3]  Surely, if this assertion is true, why has neither the State Department nor the Mexican government intervened or filed anything in this case since its filing on February 19, 2020?  *See* 28 U.S.C.A. § 517 ("The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.").

Neither have our political branches, the Mexican government, nor the State of Chihuahua expressed that they find the litigation of this case *in state court* offensive.  Indeed, the opposite is true: the State of Chihuahua, as "master of its claims", affirmatively seeks to avoid and resists a federal forum for its state-law claims.  *Williams,* 482 U.S. at 392.  The State of Chihuahua's conduct strongly indicates that it requests the state court to treat it like any other private plaintiff that might have been wronged by a defendant's tortious conduct.  "To the extent that the federal common law of foreign relations is premised on the notion that the federal courts must protect foreign sovereigns from diverse decisions by state courts, such protection ought not to be provided when it is not sought—and in fact is resisted—by foreign sovereigns, as is the case here."  *In re Tobacco/Govtl. Health Care Costs Litig.*, 100 F. Supp. 2d at 37.  "Indeed, to the

---

[3] Defendants' footnote includes citations for some these official public statements:

*See, e.g.*, Chihuahua, Gobierno del Estado ("State Government"), Dará Chihuahua batalla jurídica por bienes de César Duarte en Estados Unidos ("Chihuahua will give legal battle for César Duarte's assets in the United States") (Jan. 17, 2020), http://www.chihuahua.gob.mx/contenidos/dara-chihuahua-batalla-juridica-por-bienes-de-cesar-duarte-en-estadosunidos; Argelia Dominguez, Con Demanda Estado Busca Recuperar 50 Propiedades A Nombre De Duarte Y Prestanombres ("State Seeks To Recover 50 Properties In The Name Of Duarte And Strawman via Lawsuit") (Apr. 7, 2020), https://entrelineas.com.mx/local/con-demanda-estado-busca-recuperar-50-propiedades-a-nombre-de-duartey- prestanombres/.

Resp. in Opp'n at 10 n.2.

extent that the tortious conduct alleged occurred in Texas[,] . . . [the] state[] possess[es] [its] own strong domestic interests in adjudicating this lawsuit." *Id.*

To be sure, this lawsuit may raise issues requiring the application of foreign law, either from the State of Chihuahua or Mexico. But application of such foreign law does not by itself present federal question jurisdiction, nor are state courts precluded from applying foreign law. *Delgado v. Zaragoza*, 267 F. Supp. 3d 892, 899 (W.D. Tex. 2016) (citing *Fuent*es, 2016 WL 3512272, at *6). "Our courts have had no difficulty in distinguishing the legal acts of a [former] ruler from his acts for personal profit that lack a basis in law." *Marcos II*, 862 F.2d at 1361.

And finally, contrary to Defendants' claim, this type of cases—namely, "a civil case where a foreign sovereign accused a former government official of misconduct during his tenure as an official"—has *not* been decided exclusively and without exception by federal courts. Resp. in Opp'n at 4. In fact, as to the act of state doctrine, the Court found at least in one post-*Marcos I* case in which a state court—ironically, in New York—applied federal common law and determined that the act of state doctrine did not preclude a foreign government's action rooted in state law against its former head of state. *See Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 382–83 (N.Y. App. Div. 1st Dept. 1995) ("The issues remaining on this appeal then are whether plaintiff Haiti's conversion claim may be adjudicated in the courts of this state, and if so, whether Haiti has established its claim prima facie such that summary judgment is warranted. It is the opinion of this court that these questions be answered in the affirmative.").[4] And as to foreign

---

[4] In that case, the New York state court considered the applicability of the act of state doctrine because "the United States [had taken] an official stance in support of the Republic of Haiti's position in [that] lawsuit. In a Statement of Interest filed in [that] action, the United States asserted that it ha[d] "a substantial foreign policy interest . . . in assisting the Haitian government in recovering its assets." *Duvalier*, 211 A.D.2d at 382–83. Even with "a substantial foreign policy interest" justifying a federal forum, the state court went on to apply federal common law and determine whether the doctrine applied. In comparison, as discussed *supra*, no such "substantial foreign policy interest" justifying a federal forum is present in the instant case.

official immunity, the Court found at least one case in which a New Jersey state court applied federal common law to determine whether the defendants were entitled to foreign official immunity. *Ben-Haim v. Edri*, 183 A.3d 252, 257 (N.J. Super. App. Div. 2018) (affirming the lower court's dismissal because the State Department's SOI granting immunity to defendants, all foreign officials, was binding on the state court). Accordingly, even if the act of state doctrine or foreign official immunity were at issue in this case, it stands to reason that, just like the New York and New Jersey state courts did in those cases, a Texas state court can also apply federal common law and determine any related issues.

Therefore, the Court concludes that the State of Chihuahua's claims do not turn on substantial questions of federal law, that it lacks subject matter jurisdiction, and thus, that this lawsuit must be remanded to the state court

## IV.   CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Free and Sovereign State of Chihuahua's "Motion to Remand" (ECF No. 7) is **GRANTED.**

**IT IS FURTHER ORDERED** that the instant action is **REMANDED** to the District Court of the 448th Judicial District, sitting in El Paso County, Texas.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall **MAIL** a certified copy of this Order to the District Clerk of El Paso County, Texas.

**IT IS MOREOVER ORDERED** that all pending motions, if any, are **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that the Clerk of the Court shall **CLOSE** this case.

So ORDERED and SIGNED this 14th day of July 2020.

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE